1

2

3

4

5

6

7

8         **IN THE UNITED STATES DISTRICT COURT**

9         **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   KEVIN DAVID ROBINSON,                    No. CIV S-07-1003-FCD-CMK-P

12              Petitioner,

13       vs.                                   FINDINGS AND RECOMMENDATIONS

14   D.K. SISTO, et al.,

15              Respondents.

16   _____/

17              Petitioner, a state prisoner proceeding with appointed counsel, brings this petition

18   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the denial of parole in 2006.

19   Pending before the court are petitioner's pro se petition for a writ of habeas corpus (Doc. 1),

20   respondents' answer (Doc. 7), petitioner's pro se reply (Doc. 8), and petitioner's supplemental

21   brief (Doc. 20) filed by appointed counsel.[1]  Also before the court is petitioner's motion to

22   expand the record (Doc. 21).

23   / / /

24   / / /

25   _____

26       [1]       Petitioner's request to file supplemental briefing is granted.

                                        1

# I.  BACKGROUND

Petitioner is serving an indeterminate life sentence following his conviction for second degree murder.   Petitioner appeared before the Board of Prison Terms ("Board") in April 2006 for a parole eligibility consideration hearing.  In denying parole, the Board relied primarily on the facts of the commitment offense as well as petitioner's pre-commitment history of violence and unstable social relationships.  The Board also noted lack of insight into the nature and cause of the commitment offense, as well as some problems while incarcerated.   Further consideration of parole eligibility was deferred for three years.

As to the facts of the commitment offense, the Board stated:

> . . . This offense was aggravated by the fact that multiple victims were attacked and one was killed in the same, separate incident and the motive for the crime was extremely trivial. . . . It is often stated by inmates that the facts of the offense will never change, and that's true.  The facts won't change for you but they won't change for us either.  And so that circumstance in and of itself is a disquieting factor. . . .

The Board then continued by addressing petitioner's pre-commitment history as follows:

> . . . It's then aggravated when you look at your prior record.  First of all the fact that at the time that this offense occurred you were not a young man.  I mean, you were 30 years of age, you had some life experiences.  The recent life experience showed that you'd become accustomed to carrying weapons and to get in confrontational situations.  To the extent that there were four prior involvements with law enforcement based upon one or more combination of those factors.  The '79 incident involving carrying a weapon, the '82 incident involving confrontation with police officers, the '83 incident involving an assault on your girlfriend, and the incident just a month-and-a-half prior to this where basically you're at a gathering and you get into what starts out as a verbal argument with someone and the police end up being called for assaultive behavior.  So there is a pattern of escalating conduct. . . .

The Board also noted a history of tumultuous relationships.

Regarding petitioner's history while incarcerated, the Board sated that it "is kind of a mixed bag."  The Board focused on one incident in particular:

> . . . We note a history that has been disciplinary-free for a period of time.  What was most interesting is your last 115, there's a total of three 115s in total.  The last one was a period of time ago but the nature of it was

interesting.  It kind of started out as a direction from a custodial correctional officer over what you were wearing.  A very minor thing.  It escalated into a verbal confrontation.  The use of words such that it ended up a 115.  This started as a real insignificant incident and then got to, you know, a confrontation.  Again indicating – I guess we could say fortunately it didn't result in violence.  But what starts out as a minor incident ends up in this confrontational response, which is the same sort of behavior. . . .

The record reflects that petitioner's last disciplinary violation as of the date of the 2006 hearing occurred in 1996.

The Board also commented on petitioner's participation in self-help programming, which it characterized positively.  The Board did, however, note the following concern relating to whether petitioner had truly gained insight into the circumstances of his crime:

. . .You have taken a lot of classes in self-help.  You are able to recite to some extent things that you have learned there.  The only difficulties that a panel has in dealing with people in your stage of maturation, if you will, is trying to ascertain the difference between your ability to demonstrate that you can memorize the material and becoming confident that what you are telling us really represents a life change.  Very disturbing were your responses in a couple of areas.  How could you avoid the stabbing?  There was no alternative.  That was your immediate response to that question.  Which, you know, causes us real concern.  If you are not able to articulate the options available to you at that time, well.  You're in a controlled environment here.  It may be a potentially violent environment, it may have its problems, but the rules are laid out and after awhile you learn what you can do and you can't do.  Out in the world outside there is less controls.  So you need to be, these changes need to be constantly a part of you. . . .

The Board also noted that petitioner had stopped attending one particular self-help therapy program:

. . . Another area, why did you stop going to VORG? Well, they stopped giving me chronos.  What comes across from that is that the reason you were going was to get the chronos to demonstrate to us that you're going to self-help.  What did not come through is the – I won't say it didn't come through at all.  It shows you're on a path of enlightenment.   What comes through is you need more work to understand the impact of criminal activity, yours in this instance. . . .

/ / /

3

1    Petitioner challenged the denial of parole in a habeas petition filed in the San

2  Mateo County Superior Court.   In denying relief, the court stated:

3            Some evidence supports the Board's findings on the unsuitability
        factors.  In its decision, the Board highlighted what it described as a
4        pattern of escalation. . . . [¶] The Board also noted that although
        Petitioner's most recent serious rule violation was 10 years ago in 1996,
5        that incident also demonstrated Petitioner's tendency to escalate
        confrontations. . . . [¶] This pattern of escalation noted by the Board
6        constitutes some evidence that the Petitioner is unsuitable for Parole
        because based on the unsuitability factors enumerated in sections
7        2402(c)(1), 2402(c)(2), and 2402(c)(3) of the Code of Regulations, Title
        15.

8

9  The San Mateo County Superior Court's order did not address the Board's discussion of

10 petitioner's self-help programming.  The California Court of Appeals and California Supreme

11 Court both summarily denied relief.  Respondents admit that the petition is timely and that the

12 claims are exhausted.

13

14                      **II.  STANDARDS OF REVIEW**

15          Because this action was filed after April 26, 1996, the provisions of the

16 Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

17 applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

18 (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

19 does not, however, apply in all circumstances.  When it is clear that a state court has not reached

20 the merits of a petitioner's claim, because it was not raised in state court or because the court

21 denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

22 habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

23 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

24 petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

25 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

26 perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

                                    4

1   evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

2   petition de novo where state court had issued a ruling on the merits of a related claim, but not the

3   claim alleged by petitioner).  When the state court does not reach the merits of a claim,

4   "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

5          Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

6   not available for any claim decided on the merits in state court proceedings unless the state

7   court's adjudication of the claim:

8          (1) resulted in a decision that was contrary to, or involved an
    unreasonable application of, clearly established Federal law, as determined
9          by the Supreme Court of the United States; or

10         (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the State
11         court proceeding.

12   Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is

13   "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

14   standards, "clearly established law" means those holdings of the United States Supreme Court as

15   of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

16   (citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not

17   the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en

18   banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas

19   relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742,

20   753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)).

21   For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

22   to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a

23   state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

24   contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

25   created by state conduct at trial because the Court had never applied the test to spectators'

26   conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's

1   holdings.  See Carey, 549 U.S. at 74.

2          In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

3   majority of the Court), the United States Supreme Court explained these different standards.  A

4   state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

5   the Supreme Court on the same question of law, or if the state court decides the case differently

6   than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

7   court decision is also "contrary to" established law if it applies a rule which contradicts the

8   governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

9   that Supreme Court precedent requires a contrary outcome because the state court applied the

10  wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

11  Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

12  id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

13  determine first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040,

14  1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

15  case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

16  is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

17          State court decisions are reviewed under the far more deferential "unreasonable

18  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

19  unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

20  510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

21  that federal habeas relief may be available under this standard where the state court either

22  unreasonably extends a legal principle to a new context where it should not apply, or

23  unreasonably refuses to extend that principle to a new context where it should apply.  See

24  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

25  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

26  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

1    75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found

2    even where the federal habeas court concludes that the state court decision is clearly erroneous.

3    See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper

4    deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75.

5    As with state court decisions which are "contrary to" established federal law, where a state court

6    decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

7    unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

8

9                               **III. DISCUSSION**

10            Petitioner argues that the Board's decision was not based on some evidence of his

11   dangerousness at the time because the Board impermissibly relied solely on the immutable fats of

12   the commitment offense. Respondents argue: (1) petitioner does not have a federally protected

13   liberty interest in parole; (2) petitioner received all the process he was due because he was

14   provided notice of the hearing and an opportunity to be heard; (3) even if the "some evidence"

15   standard applies, the factors cited by the state court meet this standard.

16            In Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc), the Ninth Circuit

17   sitting en banc held that there is no federal stand-alone substantive due process right to parole.

18   See 603 F.3d 546, 555 (9th Cir. 2010) (en banc). Any substantive due process interest in parole

19   arises solely from state law creating the right. See id. The Ninth Circuit overruled its prior

20   decisions in Biggs v. Terhune, 334 F.3d 910, 915 (9th Cir. 2003), Sass v. Bd. of Prison Terms,

21   461 F.3d 1123 (9th Cir. 2006), and  Irons v. Carey, 505 F.3946, 851 (9th Cir. 2007), "[t]o the

22   extent [they]. . . might be read to imply that there is a federal constitutional right regardless of

23   whether state law entitles the prisoner to release. . . ." Hayward, 603 F.3d at 555.

24   / / /

25   / / /

26   / / /

1     Turning to whether California's parole scheme creates any substantive due

2 process rights, the Ninth Circuit stated: "Although the due process clause does not, by itself,

3 entitle a prisoner to parole in the absence of some evidence of future dangerousness, state law

4 may supply a predicate for that conclusion." Id. at 561.  The court then discussed California law,

5 including the California Supreme Court's decisions in In re Lawrence, 44 Cal.4th 1181 (2008),

6 and In re Shaputis, 44 Cal.4th 1241 (2008), and noted that ". . . as a matter of state law, 'some

7 evidence' of future dangerousness is indeed a state *sine qua non* for denial of parole in

8 California." Id. at 562.  The court then provided the following instructions for resolving parole

9 claims in the context of AEDPA:

10         Since the "some evidence" requirement applies without regard to
          whether the United States Constitution requires it, we in this case, and
11         courts in this circuit facing the same issue in the future, need only decide
          whether the California judicial decision approving the . . . decision
12         rejecting parole was an "unreasonable application" of the California "some
          evidence" requirement, or was "based on an unreasonable determination of
13         the facts in light of the evidence."

14         Id.

15 The en banc court concluded that Hayward had properly been denied parole because the nature of

16 the commitment offense combined with an unfavorable psychological evaluation provided "some

17 evidence" under California law of future dangerousness. See id.

18     Interpreting the en banc decision in Hayward, the Ninth Circuit in Person v.

19 Muntz stated: "By holding that a federal habeas court may review the reasonableness of the state

20 court's application of the 'some evidence' rule, Hayward, necessarily held that compliance with

21 the state requirement is mandated by federal law, specifically the Due Process Clause."  606 F.3d

22 606, 609 (9th Cir. 2010) (per curiam).  The court observed that "[t]he principle that state law

23 gives rise to liberty interests that may be enforced as a matter of federal law is long-established."

24 Id.

25 / / /

26 / / /

1          As has been clearly stated by the Ninth Circuit, California law provides the

2    contours of the substantive due process right to parole at issue in this case.  Under California law,

3    one year prior to an inmate's minimum eligible parole release date, the Board will set a date for

4    an eligibility hearing.  See Cal. Penal Code § 3041(a).   A release date shall be set unless release

5    currently poses an unreasonable risk of danger to society.  See Cal. Penal Code § 3041(b).  The

6    paramount concern in determining parole suitability in California is public safety.  See In re

7    Dannenberg, 34 Cal.4th 1061 (2005).  This requires an assessment of the inmate's current

8    dangerousness.  See In re Lawrence, 44 Cal.4th at 1205.  Such an assessment requires more than

9    "rote recitation of the relevant factors with no reasoning establishing a rational nexus between

10   those factors and the necessary basis for the ultimate decision – the determination of current

11   dangerousness."  Id. at 1210.

12          California regulations set forth various circumstances which tend to show

13   suitability and others which tend to show unsuitability.  See Cal. Code Regs., tit 15 § 2402(c)-(d).

14   Under § 2402(c), circumstances tending to show unsuitability include: (1) the facts of the

15   commitment offense, where the offense was committed in an especially heinous, atrocious, or

16   cruel manner; (2) the prisoner's previous record of violence; (3) a history of unstable

17   relationships with others; (4) commission of sadistic sexual offenses; (5) a lengthy history of

18   severe mental problems related to the offense; and (6) serious misconduct while in prison.

19   Circumstances tending to show suitability include: (1) lack of a juvenile record; (2) reasonably

20   stable relationships with others; (3) the prisoner has shown remorse; (4) lack of significant

21   history of violent crimes; (5) realistic plans for release; and (6) participation in institutional

22   activities indicating an enhanced ability to function within the law upon release.  See Cal. Code

23   Regs., tit. 15 § 2402(d).  The regulations are designed to guide the Board's assessment regarding

24   whether the inmate poses an "unreasonable risk of danger to society if released from prison," and

25   thus whether he or she is suitable for parole.  In re Lawrence, 44 Cal.4th at 1202.  There must be

26   a rational nexus between the facts cited by the Board and the ultimate conclusion on

1   dangerousness.  See id. at 1227.

2          Regarding reliance on the facts of the commitment offense, the denial of parole

3   may be predicated on the commitment offense only where the Board can point to factors beyond

4   the minimum elements of the crime that demonstrate that, at the time of the suitability hearing,

5   the inmate will present an unreasonable risk of danger to society if released.  See In re

6   Dannenberg, 34 Cal.4th at 1071.  While the Board cannot require an inmate to admit guilt in

7   order to be found suitable for parole, see Cal. Penal Code § 5011(b); 15 Cal Code Regs., tit. 15,

8   § 2236, the Board must consider the inmate's past and present attitude toward the crime and any

9   lack of remorse or understanding of the nature and magnitude of the offense, see 15 Cal. Code

10  Regs., tit. 15, §§ 2402(b), 2402(d)(3).  "Lack of insight" is probative of unsuitability only to the

11  extent that it is both demonstrably shown by the record and rationally indicative of the inmate's

12  current dangerousness.  See In re Calderon, 184 Cal.App.4th 670, 690 (2010).

13         In light of the precedents outlined above the court concludes that petitioner has a

14  protected liberty interest in parole arising from state law.  The court also concludes that the

15  contours of the substantive guarantee required to protect that liberty interest are defined by state

16  law and that under California law parole may not be denied unless there is "some evidence" of

17  the inmate's dangerousness at the time of the parole eligibility hearing.  Respondents' arguments

18  to the contrary are rejected.

19         In this case, the court finds that there is some evidence supporting the Board's

20  denial of parole.  While not specifically discussed by the state courts, this court notes the Board's

21  discussion of petitioner's lack of insight.  When asked at the 2006 hearing how the commitment

22  offense could have been avoided, petitioner stated that there was no alternative.  As the Board

23  indicated, this demonstrated a lack of understanding of the seriousness of his crime.  The Board

24  was reasonably concerned that such a lack of insight, despite participation in self-help

25  programming and a long history of incarceration, indicated a current danger to the community.

26  In addition, when asked why he stopped attending one particular self-help class, petitioner stated

1   that he did so because "chronos" were no longer being given.  As the Board noted, this suggests

2   that petitioner was attending the class to receive the "chronos" and not to gain any real insights.

3            Finally, the court turns to petitioner's motion to expand the record.  In this

4   motion, petitioner asks that the record be expanded to include portions of the transcript of a

5   parole suitability hearing for another prisoner – David Priest.  According to petitioner, the Board

6   stated at Mr. Priest's hearing that, as a rule, disciplinary violations more than 5 years old are not

7   considered.  Thus, petitioner concludes that the Board should have been bound to this same rule

8   in his case and, therefore, should not have considered the 1996 disciplinary violation.

9            The court finds no basis to expand the record.  Ignoring the Board's discussion of

10  the 1996 rules violation, other evidence supports the Board's decision in this case, as discussed

11  above.  In other words, petitioner's argument concerning what the Board in Mr. Priest's case said

12  is unavailing in this case because other evidence supported the Board's decision.  Expanding the

13  record is simply unnecessary to resolve this case.  Moreover, petitioner has not presented any

14  evidence that the "rule" expressed by the Board in Mr. Priest's case is actually an official policy

15  applicable in all cases, as opposed to an unwritten rule the Board in Mr. Priest's case chose to

16  apply.

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus (Doc. 1) be denied, petitioner's motion to expand the record (Doc. 21) be denied, and that all other pending requests/motions be denied as moot.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


 DATED: August 13, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE